UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF IOWA

CEDAR RAPIDS DIVISION

| | |
|---|---|
| PHILIP A. KRAMER, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>       v.<br><br>AEGON USA LLC, TRANSAMERICA FINANCIAL LIFE INSURANCE COMPANY, TRANSAMERICA RETIREMENT SOLUTIONS CORPORATION, RALPH ARNOLD, KIRK BUESE, KEN KLINGER, DIANE MEINERS, and MARY TAIBER,<br><br>          Defendants. | Case No.    15-CV-31-EJM<br><br>**CLASS ACTION COMPLAINT** |

1.     Plaintiff Philip Kramer, individually and on behalf of all others similarly situated, brings this action on behalf of the TRANSAMERICA Profit Sharing Plan (the "Plan"), formerly known, though December 31, 2014, as the AEGON Companies Profit Sharing Plan, against Defendants AEGON USA LLC ("AEGON"), Transamerica Financial Life Insurance Company ("TFLIC"), Transamerica Retirement Solutions Corporation ("TRSC"), and the trustees of the Plan, Kirk Buese, Ralph Arnold, Ken Klinger, Mary Taiber, and Diane Meiners (collectively "Defendants").

## NATURE OF THE ACTION

2.     Defendants are the sponsors, administrators, record keepers, managers, trustees and fiduciaries of the Plan, a defined contribution retirement plan with assets of more than $1.5 billion, in which Plaintiff and more than 16,000 other employees, retirees and beneficiaries

participate. As alleged in detail below, Defendants have breached their fiduciary duties to the Plan and its participants, and have caused the Plan to engage in ERISA-prohibited transactions, by structuring the Plan in such a way as to maximize fee income to themselves and their affiliated companies, causing the Plan and participants to pay millions of dollars in excessive and unnecessary fees.

3. Defendants' conduct alleged herein is in violation of the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). Specifically, Plaintiff alleges violations of ERISA §§ 404, 406, 409, 502(a)(2), 29 U.S.C. §§ 1104, 1106, 1109, 1132(a)(2), based on the fact that Defendants' breached their fiduciary duties and engaged in ERISA-prohibited transactions in connection with the administration of the Plan. Plaintiff seeks relief on behalf of a proposed class (the "Class") of Plan participants during the period of April 7, 2009 to the present (the "Relevant Period"). Specifically, Plaintiff seeks damages for losses that the Class suffered as a result of Defendants' conduct as well as disgorgement of unlawful fees, expenses, and profits taken by Defendants for their own benefit.

4. As fiduciaries of the Plan, Defendants are required by ERISA to act solely in the interest of the Plan's participants when making decisions about selecting, retaining, removing, replacing, and monitoring the Plan's investments and vendors, and acting to defray reasonable expenses of administering the Plan. Rather than fulfilling these fiduciary duties by offering Plaintiff and other participants in the Plan prudent investment options at reasonable cost, Defendants acted in their self-interests and the interests of their affiliates by maintaining AEGON-managed investment products in the Plan with excessive and unnecessary management fees, and by failing to adequately monitor and remove or replace those investments despite their high fees. In addition, Defendants caused the Plan to pay, directly and indirectly, excessive Plan administration fees to AEGON or its affiliate.

5. Defendants have breached their fiduciary duties by making self-interested decisions with respect to Plan investments and services that benefit Defendants and their affiliates rather than the Plan and Plan participants, as described further below.

6. In choosing investment options for the Plan, Defendants have maintained many of AEGON'S own investment products in the Plan, including at least fourteen AEGON-managed investments in pooled separate accounts, each with a specific investment strategy or objective. These separate accounts are commingled investment funds with multiple investors, similar to mutual funds. Like mutual funds, such investment vehicles typically charge administrative and investment management fees for managing the securities in the portfolio. In the case of the AEGON pooled separate accounts in the Plan, however, AEGON charges a substantial investment management fee without providing any corresponding investment management services of any value. Instead, the manager of each pooled separate account simply reinvests in an AEGON mutual fund of the same asset class and strategy. Since no portfolio management or advisory services are actually provided with respect to these accounts, the investment management fee represents an unnecessary and excessive expense to the Plan which benefits only AEGON and its affiliates.

7. In addition to the substantial account level investment management fees described above, AEGON, through its corporate affiliate, also charges an investment management fee at the underlying mutual fund level. Once again, however, AEGON does not manage the portfolios of the underlying mutual funds in which the pooled separate accounts are invested. Instead, it hires sub-advisors to select the stocks and bonds in which the mutual funds are invested, engage in trading and otherwise manage the mutual fund portfolios. Although AEGON does little more than pick the sub-advisors for these underlying mutual funds, it charges a substantial advisor fee. The difference between the amount of that advisory fee collected by AEGON and the amount it

-3-

pays to the sub-advisor represents additional, unnecessary fees that are borne by the Plan and Plan participants and that benefit AEGON. Because the mutual fund management investor fee is often multiples of the sub-advisor fee, this excess layer of fees is substantial.

8.     In its capacity as record keeper for the Plan, AEGON, through a corporate affiliate, receives compensation in the form of revenue sharing from the managers of the investment options in the Plan. In other words, a percentage of the management fee charged by that investment manager is paid to AEGON for its record keeping services. Because such revenue sharing payments are calculated as a percentage of assets under management, as the assets grow they increase proportionally to the increase in assets under management. On the other hand, the cost of record keeping is relatively fixed and does not increase significantly as assets under management increase. To take this difference into account and ensure that a plan and plan participants are not paying excessive fees for recordkeeping as the plan increases in size, plan fiduciaries for large plans like the Plan will typically require that all revenue sharing payments in excess of the actual or reasonable costs of record keeping be rebated to the plan. Defendants did not negotiate or put in place such an arrangement here, causing the revenue sharing payments retained by AEGON to far exceed the actual costs of recordkeeping. By failing to require such rebates, Defendants acted imprudently and in breach of their duty of loyalty, to the substantial harm of the Plan and Plan participants and to the substantial benefit to AEGON and its corporate affiliates, which receive the excessive fees.

9.     As the manager and fiduciaries of an ERISA plan with assets under management in excess of a billion dollars, AEGON and its co-defendants have the leverage and capacity to negotiate very favorable fee structures with sub-advisors and other service providers to keep Plan fees and costs as low as possible. Defendants failed to take advantage of this bargaining power. Instead, acting in their own interests, Defendants managed the Plan in a manner designed to

benefit themselves, in breach of their fiduciary obligations under ERISA.

## JURISDICTION AND VENUE

10. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

12. Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b) and (c), venue is proper in this District because Defendants AEGON and Transamerica Financial Life Insurance Company both have their principal place of business in this District, in Cedar Rapids, Iowa. In addition, the violations alleged herein occurred in this District.

## THE PARTIES

13. Plaintiff Philip A. Kramer ("Plaintiff") is a resident of Iowa and a participant in the Plan.

14. Throughout the Relevant Period, Plaintiff (through his participation in the Plan) was invested in the Core Bond Fund separate account.

15. Plaintiff was not provided any information regarding the substance of any deliberations by Defendants concerning the Plan's menu of investment options during the Relevant Period. Plaintiff otherwise has no knowledge of the substance of the deliberations, or of the nature of the investments he selected in the Plan beyond what was provided to him by the Plan. Plaintiff discovered his claims shortly before the filing of this action.

16. Defendant AEGON USA, LLC ("AEGON") is a wholly owned indirect subsidy of AEGON N.V., a holding company organized under the laws of the Netherlands and a multinational provider of insurance, and pension and asset management. AEGON is a citizen of

Iowa with its headquarters in Cedar Rapids, Iowa. AEGON provides life insurance and financial services, including the management of retirement plans, and a range of investment products, including retail mutual funds and unregistered investment vehicles such as collective trusts and pooled separate accounts. AEGON is the plan sponsor for the Plan and serves as the plan administrator, and through its corporate affiliate, TRSC, is the record keeper for the Plan.

17.     AEGON is a fiduciary for the Plan because it established and administers investments held by the Plan. AEGON is also a fiduciary for the Plan because, through its Board of Directors, it appoints, monitors, and removes the Trustees of the Plan.

18.     Defendant Transamerica Financial Life Insurance Company ("TFLIC") is a subsidiary of AEGON. In its own capacity or through one or more of its affiliates, TFLIC serves as the manager of the pooled separate accounts in which the Plan invests and is a fiduciary for those separate accounts.

19.     Defendant Transamerica Retirement Solutions Corporation ("TRSC"), previously known as Diversified Investment Advisors, is a wholly owned subsidiary of AEGON. TRSC is the record keeper for the Plan and a fiduciary of the Plan.

20.     Defendants Ralph Arnold, Kirk Buese, Ken Klinger, Diane Meiners and Mary Taiber are and were Trustees of the Plan, appointed by AEGON's Board of Directors, during the Relevant Period. In their capacity as Trustees of the Plan, these Defendants administer the Plan, select, monitor, maintain, delete and add investment options in the Plan, and hire the service providers to the Plan. The Trustees are responsible for monitoring Plan investments and vendors and have discretion to add or remove investment options offered in the Plan. All of the named Trustee Defendants are or were employees or officers of AEGON or a corporate affiliate of AEGON during some or all of the Relevant Period.

CLASS ACTION COMPLAINT
*PHILIP KRAMER V. AEGON USA, LLC, ET AL.*

## THE PLAN

21.     The Plan is an "employee benefit pension plan" within the meaning of ERISA §

3(2)(A), 29 U.S.C. § 1002(2)(A) AND a "defined contribution plan" within the meaning of

ERISA § 3(34), 29 U.S.C. § 1002(34).

22.     The Plan covers eligible employees of AEGON and of other participating

employers, some or all of which are affiliates of AEGON.

23.     According to Form 5500 filed by AEGON, the Plan had 16,715 participants as of

the end of the 2013 plan year, including active participants, retired or separated participants

receiving benefits or entitled to future benefits, and deceased participants whose beneficiaries are

receiving or entitled to receive benefits.  The Plan held $1.56 billion in assets at the end of the

2013 plan year.

24.     During the Relevant Period, the Plan has invested in the following pooled separate

accounts for which TFLIC is the sponsor: : the Core Bond Fund; the High Quality Bond Fund;

the High Yield Bond Fund; the Intermediate Horizon Asset Allocation Fund; the

Intermediate/Long Horizon Asset Allocation Fund; the International Equity Fund; the Large Core

Fund; the Large Growth Fund; the Large Value Fund; the Long Horizon Asset Allocation Fund;

the Mid Value Fund; Short Horizon Asset Allocation Fund; the Short/Intermediate Horizon Asset

Allocation Fund; and the Small Core Fund. In addition, the Plan has invested in AEGON N.V.

stock, affiliated collective trust funds which included an affiliated Stock Index Fund and Real

Estate Fund, and an affiliated Stable Value Fund.   For all of its affiliated investment options

other than AEGON stock, which together constituted more than 85% of Plan assets at the end of

the 2013 plan year, AEGON charged investment management and other fees. The Plan also

invested in unaffiliated mutual funds, including Columbia's Acorn Z; Oppenheimer's Developing

Markets Y and Developing Markets N; and Vanguard's Inflation Protected Securities Institutional

Class and Small Cap Index Institutional Class.  The Plan also offers a brokerage window through Charles Schwab.

25.    The Trustees of the Plan, all of whom are employees of AEGON, are responsible for adding to, maintaining, or deleting funds from the investments made available to Plan participants.  The Trustees meet periodically to fulfill this responsibility and make decisions about the addition, retention or removal of funds, and have done so within the last six years.

## DEFENDANT'S OBLIGATIONS AND PROHIBITED CONDUCT UNDER ERISA

26.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  ERISA § 404(a), 29 U.S.C.§ 1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and —
>
>> (A) For the exclusive purpose of:
>>
>>> (i)      Providing benefits to participants and their
>>>          beneficiaries; and
>>>
>>> (ii)     Defraying reasonable expenses of
>>>          administering the plan;
>>
>> (B) With the care, skill, prudence, and diligence under the
>> circumstances then prevailing that a prudent man acting in a like
>> capacity and familiar with such matters would use in the conduct of
>> an enterprise of like character and with like aims;
>>
>> (C) By diversifying the investments of the plan so as to
>> minimize the risk of large losses, unless under the circumstances it

-8-

is clearly prudent not to do so; and

(D) In accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

27.    ERISA also imposes liability on a fiduciary for the unlawful conduct of its co-fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, as follows:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)    If, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

28.    Under ERISA, fiduciaries that exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants in the plan when selecting investments and retaining service providers. Thus, "the duty to conduct an independent investigation into the merits of a particular

-9-

investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996).

As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan.

> [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return. DoL Ad. Op. No. 88-16A.

29.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding & which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable. DoL Ad. Op. No. 2013-03A.

30.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.

> A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan. DoL Ad. Op. No. 88-16A.

31.     The Department of Labor counsels that fiduciaries are responsible for ensuring that

a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate

differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable. In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs. Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options. *Meeting Your Fiduciary Responsibilities*, U.S. DEP'T OF LABOR http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (Last visited Mar. 25, 2015).

32.     In a separate publication, the Department of Labor writes:

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided. By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers. *Understanding Retirement Plan Fees and Expenses*, U.S. DEP'T OF LABOR

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html (last visited Mar. 25, 2015).

33. ERISA also prohibits certain transactions with plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA § 406, 29 U.S. Code § 1106, provides as follows:

(a) Transactions between plan and party in interest except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect

(A) Sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) Lending of money or other extension of credit between the plan and a party in interest;

(C) Furnishing of goods, services, or facilities between the plan and a party in interest;

(D) Transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) Acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should

-12-

know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary. A fiduciary with respect to a plan shall not

(1) Deal with the assets of the plan in his own interest or for his own account,

(2) In his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) Receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## DEFENDANTS' VIOLATIONS OF ERISA

### The Retention of Investment Options and Managers that Caused the Plan to Pay Excessive and Unnecessary Fees to Defendants and Their Affiliates

34.     Institutional investors, including large retirement plans, have substantial bargaining power in the market for investment products which enable them to negotiate lower fees from investment managers. A prudent and loyal fiduciary for a large retirement plan with assets in excess of $1 billion such as the Plan is expected to use that bargaining power to negotiate reasonable fees for the benefit of the plan given the size of the plan.

35.     Although the Plan has had more than $1 billion in assets for at least the last six years, and currently has approximately $1.6 billion in assets, Defendants failed to use the Plan's bargaining power to achieve reasonable fees for the Plan.  Instead, Defendants have maintained a

Plan structure that includes affiliated investment options which result in the payment of unreasonable, excessive and unnecessary fees to AEGON and its corporate affiliates.

36.     As of the end of the 2013 plan year, approximately $684 million of Plan assets was invested in nine pooled separate accounts managed by Transamerica Financial Life Insurance Company.  Although these accounts have names similar to the names of mutual funds, they are not mutual funds but non-registered investment products established by AEGON for the purpose of the Plan.  As of the end of the 2013 plan year, they included the Core Bond Fund, the International Equity Fund, the Large Core Fund, the Large Growth Fund, the Large Value Fund, the Mid Value Fund, the Small Core Fund, the High Yield Bond Fund, and the High Quality Bond Fund.  During the Relevant Period, the Plan has included at least 5 other such accounts, including the Intermediate Horizon SAF, the Intermediate Long Horizon SAF, the Long Horizon SAF, the Short Horizon SAF and the Short Intermediate Horizon SAF.  These accounts have accounted for close to 50% of total Plan assets.

37.     Although AEGON affiliate TFLIC is identified as the sponsor of these separate accounts and collects a fee for managing the accounts, these separate accounts are not "managed" the way a mutual fund is managed, through the selection, monitoring and trading of a portfolio of stocks or bonds to achieve a specified investment objective.  Instead, each separate account serves essentially as a "shell" account which simply invests Plan assets from participant contributions in a corresponding Transamerica mutual fund having the same investment objective.

38.     TFLIC does little more than reinvest participant contributions to these accounts in the corresponding Transamerica mutual fund.  Nonetheless, it charges a substantial management fee at the account level, ranging from approximately 26 basis points (bps) to 80 basis points, for its services.  This is a totally unnecessary fee incurred by the Plan and Plan participants, as participant contributions could be invested directly in the underlying mutual funds to the same

-14-

effect, without incurring any account level fees.

39.     The following table identifies, for each separate plan account, the account management fee that TFLIC charges and the corresponding Transamerica mutual fund in which the account invests:

| Table 1 | | |
|---|---|---|
| **Plan Account** | **Account Management Fee** | **Corresponding Affiliated Mutual Fund** |
| Core Bond Fund | .40% | Transamerica Partners Core Bond Fund (DVGCX) |
| International Equity | .80% | Transamerica Partners Institutional Equity Fund (DIIEX) |
| Large Core Fund | .65% | Transamerica Partners Large Core Fund (DVGIX) |
| Large Growth Fund | .65% | Transamerica Partners Large Growth Fund (DVEGX) |
| Large Value Fund | .50% | Transamerica Partners Large Value Fund (DVEIX) |
| Mid Value | .70% | Transamerica Partners Institutional Mid Value Fund (DIMVX) |
| Small Core | .85% | Transamerica Partners Small Core Fund (DVPEX) |
| High Yield Bond | .50% | Transamerica Partners Institutional High Yield Bond Fund (DIHYX) |
| High Quality Bond | .40% | Transamerica Partners Institutional High Quality Bond Fund (DIHQX) |
| Intermediate Horizon | .26% | Transamerica Asset Allocation Intermediate Horizon Fund (DVMSX) |
| Intermediate/Long Horizon | .26% | Transamerica Asset Allocation Intermediate/Long Horizon Fund (DVASX) |
| Long Horizon | .29% | Transamerica Asset Allocation Long Horizon Fund (DVLSX) |
| Short Horizon | .26% | Transamerica Asset Allocation Short Horizon Fund (DVCSX) |
| Short/Intermediate Horizon | .26% | Transamerica Asset Allocation Short/Intermediate Horizon Fund (DVSIX) |

40.     Defendants permit this separate account arrangement even though the superfluous

additional fee is charged at the separate account level. These separate account level fees approach or exceed the mutual fund fee, even though Transamerica provides no service of value in exchange for these added fees. Defendants benefit from the arrangement, however, as TFLIC is the recipient of these excessive fees.

41.     The adverse impact on the Plan of charging superfluous fees at the account level is compounded by the fact that the AEGON-affiliated advisors of the corresponding underlying mutual funds also charge a management or advisor fee for providing little or no service in connection with the management of those funds. These affiliated advisors, which include Transamerica Asset Management ("TAM"), DRC and TFLIC, do not actually provide portfolio management or other advisory services for the mutual funds. Instead, each mutual fund advisor hires a sub-advisor to manage the mutual fund portfolio. The AEGON affiliate collects a management fee ranging from 10 to 80 bps, and pays the sub-advisor(s) a much smaller fee to do the actual portfolio management, retaining the difference for itself.

42.     The following table identifies the mutual fund manager, the management fee, the sub-advisor(s), the maximum sub-advisor fee, the and the difference retained by the manager for each fund:

| Table 2 | | | | | |
|---------|---|---|---|---|---|
| Plan investment | Mutual fund Manager | Mutual fund mgmt. fee | Sub-Advisor | Sub-Advisor Fee | Difference retained by manager |
| Core Bond | TAM | .35% | Aegon USA Investment Mgmt. LLC | .12% | .23% |
| International Equity | TAM | .74% | Thompson, Siegel & Walmsley | .30% | .44% |
| Large Core Fund | TAM | .60% | Aronson Johnson Ortiz | .30% | .30% |

| | | | | | |
|---|---|---|---|---|---|
| Large Growth Fund | TAM | .62% | Wellington Management | .40% | .22% |
| Large Value Fund | TAM | .45% | Aronson Johnson Ortiz | .30% | .15% |
| Mid Value Fund | TAM | .67% | Thompson Siegel & Walmsley | .275% | .395% |
| Small Core Fund | TAM | .80% | Systematic Financial Mgmt. | .425% | .375% |
| High Yield Bond | TAM | .55% | Eaton Vance Management | .35% | .20% |
| High Quality Bond | TAM | .35% | Merganser Capital Mgmt. | .20% | .15% |
| Intermediate Horizon | TFLIC | .10% | Multiple | Multiple | Varied |
| Intermediate/ Long Horizon | TFLIC | .10% | Multiple | Multiple | Varied |
| Long Horizon | TFLIC | .10% | Multiple | Multiple | Varied |
| Short Horizon | TFLIC | .10% | Multiple | Multiple | Varied |
| Short/Intermediate Horizon | TFLIC | .10% | Multiple | Multiple | Varied |

43.    Defendants could have contracted directly with each of the sub-advisors listed in

Table 2 to provide exactly the same portfolio management services for the same price, thereby

saving the Plan the difference between the management fees that Defendants' affiliates collected

and the amounts paid to the sub-advisors.  For example, Aronson Johnson Ortiz, the sub-advisor

for the large value fund, publicly advertises investment management services for a large cap fund

benchmarked against the Russell 1000 index, the same index benchmarked by the Plan's large

value fund.  Aronson Johnson Ortiz charges a management fee of 30 basis points on the first $250

million, decreased in three steps to 12.5 basis points on amounts over $1 billion.

44.    Instead of contracting directly with outside advisors to provide portfolio

management services, Defendants chose to insert an extra layer of mutual fund fees, paid to

AEGON affiliates at the Plan's expense.  As Table 3 illustrates, these fees exceed the amounts

paid to the sub-advisors, even though it is the sub-advisors who actually provide the management

services, while the mutual fund manager provides little or no services of value to the Plan in exchange for the fee stacked on top of the sub-advisor fee.

45.     As a result of this arrangement, the Plan pays a mutual fund fee well in excess of the actual cost of providing advisory and portfolio management services for each mutual fund. Using the example of the large value fund, the Plan pays TAM a mutual fund fee of 45 basis points, well in excess of the 30 basis points or less charged by Aronson Johnson Ortiz.

46.     The same arrangement of excess management fees at the mutual fund level and separate account level is present in all of the pooled separate accounts in which the Plan invested. When the separate account fee and the mutual fund management fee are considered together, the cumulative adverse impact on the Plan in terms of the fee burden is substantial.  Again using the example of the large value fund, the Plan ends up paying a combined management fee of 95 basis points, *i.e.*, 50 basis points in separate account charges and 45 basis points in mutual fund fees. This represents a mark-up of 65 basis points -- 217% -- of the fees charged by the sub-advisor, Aronson Johnson Ortiz.  This markup is pure profit to AEGON, with no added benefit to the Plan.

47.     The following table shows, for each separate account, the separate account fee, the mutual fund management fee, the total of the two, the maximum sub-advisor fee, the amount retained by AEGON and its affiliates, and the mark up over the sub-advisor fee that that amount represents:

| Table 3 | | | | | |
|---|---|---|---|---|---|
| Plan investment | Separate account mgmt. fee | Mutual fund mgmt. fee | Total fee | Maximum sub-advisor fee | Fees charged by Aegon / markup |
| Core Bond | .40% | .35% | .75% | .12% | .63% / 525% |
| International Equity | .80% | .74% | 1.54% | .30% | 1.24% / 413% |
| Large Core | .65% | .60% | 1.25% | .30% | .95% / 317% |
| Large Growth | .65% | .62% | 1.27% | .40% | .97% / 218% |

| | | | | | |
|---|---|---|---|---|---|
| Large Value | .50% | .45% | .95% | .30% | .65% / 217% |
| Mid Value | .70% | .67% | 1.37% | .275% | 1.095% / 398% |
| Small Core | .85% | .80% | 1.65% | .425% | 1.225% / 288% |
| High Yield Bond | .50% | .55% | 1.05% | .35% | .70% / 200% |
| High Quality Bond | .40% | .35% | .75% | .20% | .55% 275% |
| Intermediate Horizon | .26%[1] | .10% | | | |
| Intermediate/ Long Horizon | .26%[1] | .10% | .36%[2] | Multiple | Varied |
| Long Horizon | .29%[1] | .10% | .39%[2] | Multiple | Varied |
| Short Horizon | .26%[1] | .10% | .36%[2] | Multiple | Varied |
| Short/Intermediate Horizon | .26%[1] | .10% | .36%[2] | Multiple | Varied |

[1] This value reflects a percentage calculated from the actual dollar value of fee as listed on the Form 5500, not the published management fee as provided to Plan participants in Plan disclosures.
[2] This amount is charged in addition to underlying fund fees.

48. The actual differential between fees charged by AEGON and fees charged by the sub-advisors, and the corresponding markup, may well be greater than identified above. It is standard industry practice for sub-advisors to agree to aggregate the assets of any existing registered investment company having the same sponsor and investment objectives in setting the price that it charges for investment advisory services. The sub-advisors here would likely have agreed to include the Plan in such an aggregation arrangement to acquire and keep AEGON's business. Thus, the Plan could have obtained the best fee terms available to AEGON had Defendants used the Plan's assets and bargaining power to the Plan's advantage. Instead, Defendants chose a fee arrangement that benefited AEGON and its affiliates and cost the Plan millions of dollars in unnecessary and excessive fees.

49. The table above also understates the total fees paid by the Plan because it includes only investment management and advisory fees and excludes other fees that the Plan pays.

50. By maintaining the above-described plan investment options and fee structure,

Defendants have completely disregarded and breached their obligations under ERISA to act prudently and solely in the interests of the Plan with respect to Plan assets and, in particular, the selection and monitoring of Plan investments and managers. Instead of maintaining investment options with reasonable fees, Defendants chose and maintained investment options for the Plan that were, in essence, shell accounts for affiliated mutual funds with added-on account-level fees in addition to mutual fund fees that far exceeded the costs of managing the underlying mutual funds, as reflected by the amounts charged by the mutual fund sub-advisors. The separate accounts selected and maintained by Defendants as investment options for the Plan did nothing but invest in affiliated mutual funds, but charged a substantial fee for doing so. The mutual fund advisors, in turn, charged additional management fees, even though they turned over the actual management of the mutual fund portfolios to sub-advisors who undertook that responsibility for a substantially smaller fee. Thus, Defendants caused the Plan to incur unwarranted layers of fees, none of which benefited the Plan and all of which were paid to Defendants and their affiliated companies.

51. The effect of Defendants' breaches of fiduciary duty with respect to fees incurred by the Plan is illustrated by a comparison of fees paid by the Plan to fees paid by other Plans of its size, *i.e.*, plans with over $1 billion in assets. According to a December 2014 publication of BrightScope and the Investment Company Institute, such plans have a median asset-weighted total fee of 30 basis points, including investment management fees, administrative fees, and other fees such as insurance charges. *See Defined Contribution Plan Profile: A Close Look at 401(k) Plans,* at 42, Figure 4.2, *available at* www.ici.org/pdf/ppr14dcplanprofile401k.pdf (the "401(k) Report") (last viewed on March 24, 2015). Here, it is estimated that the Plan paid weighted average fees of over 160 basis points in each year of the Relevant Period on its investments in the AEGON separate accounts. This is more than five times the median, for plans with assets greater

than $1 billion, even though this estimate, unlike the figures in the 401(k) Report, does not include additional insurance charges or administrative fees. Had the Plan paid a weighted average fee of even 35 basis points a year during the Relevant Period, it would have saved more than $40 million in fees, all of which was collected by AEGON and its affiliated companies.

**The Failure to Recapture Revenue Sharing Payments to AEGON Affiliates that Exceeded the Actual or Reasonable Costs of Record Keeping**

52.     In addition to being the Plan sponsor and administrator, AEGON, through its affiliate TRSC, serves as record keeper to the Plan. In its role as record keeper it is responsible for maintaining individual participant records for defined contribution plan assets and posting contributions, investment earnings, withdrawals, and benefit payments to the individual participant accounts.

53.     It is common for a record keeper to receive compensation for its services in the form of "revenue sharing." Under this model, a mutual fund advisor pays a share of its investment advisory fee to the record keeper. Like the investment advisory fee itself, this share is calculated in terms of basis points. The revenue sharing payments received by the record keeper defray or offset the fees that it would otherwise be charged directly to the plan.

54.     The amount of revenue sharing paid to a record keeper by an advisor to a mutual fund depends on several factors. Advisors to actively managed funds generally pay more revenue sharing than index funds. Many index fund advisors pay no revenue sharing at all. Equity fund advisors generally pay more revenue sharing than bond fund advisors.

55.     Because AEGON, through its affiliates, serves as both the advisor for the mutual funds in which the Plan invests and the Plan's record keeper, a percentage of the amount earned by AEGON in its capacity as investment advisor is paid to itself in its capacity as record keeper.

56.     Participants in the Plan are provided little if any information about administrative

and record keeping fees. The Form 5500 for the Plan discloses that Transamerica Retirement Solutions, a subsidiary of AEGON, receives indirect compensation from Plan investments, but not the amount of such compensation.

57. It is the responsibility of the Plan Trustees and other fiduciaries to the Plan to ensure that the fees paid by the Plan to record keepers, like the fees paid to all vendors, are reasonable.

58. Because the amount of revenue sharing is measured in basis points as a percentage of Plan assets managed by the mutual fund, the revenue sharing payments received by the record keeper increase in direct proportion to any increase in the plan assets under management. However, the costs of record keeping and other administrative services remain relatively constant, increasing only minimally as plan assets increase. Thus, as a plan grows in size, revenue sharing payments will exceed the market rate for the value of the record keeping services being provided.

59. As revenue sharing payments paid to a record keeper come to exceed the market rate for the value of services provided, a fiduciary is obligated to take steps to maintain or restore the reasonableness of the fee. A prudent and loyal fiduciary will do so by seeking to cap or recapture a portion of the revenue sharing.

60. Because of their size, large plans like the Plan are in a position to negotiate revenue sharing recapture agreements. Under such agreements, the record keeper and the plan's fiduciaries agree to cap record keeping and administrative fees at a fixed amount, usually a per-participant dollar amount. To the extent that revenue sharing payments to the record keeper exceed the capped amount, the difference is rebated to the plan.

61. The Plan has the ability to obtain among the most favorable revenue sharing recapture arrangements in the market for several reasons. First, the Plan is a large defined contribution plan, with more than $1.5 billion in assets as of the end of the 2013 plan year. A

-22-

plan this size will typically generate millions of dollars in revenue sharing payments annually. Second, the Plan is heavily invested in AEGON investments, giving AEGON great incentive to provide favorable revenue sharing payments to the Plan to obtain and keep the Plan's business. Third, all but one of the AEGON and the large majority of the Plan's investment options are in actively managed investments, which generate high fees for the fund advisor and correspondingly high levels of revenue sharing.

62.     According to a recent survey by NEPC, an independent investment consulting firm, the median record keeping fee for plans with bundled service arrangements, such as the Plan here, was $86 per participant. *See* NEPC, *2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors are Doing Now,* at 2 (October 2014) (the "NEPC Survey"), *available at* http://www.nepc.com/writable/research_articles/file/2014_10_nepc_2014_ defined_contribution_plan_and_fee_survey-_what_plan_sponsors_are_doing_now.pdf. In contrast, where vigilant fiduciaries have negotiated a per-participant record keeping fee, the median fee is $50 per participant (and the median total plan expense ratio is 33 basis points — consistent with the aforementioned 401(k) Report). *Id.* Further, the Plans in the survey that adopt the per-participant model are, like the Plan here, billion dollar plans. *Id.*

63.     Assuming the Plan's record keeping fees are in line with the median for bundled services, the Plan is paying AEGON an extra $36 per participant as compared to peer billion dollar plans in the survey. As of the end of the 2013 Plan year, the Plan had 16,715 combined participants and deceased participants with beneficiaries receiving benefits. Assuming the $36 excess per-participant fee, the Plan paid AEGON an excess record keeping fee of approximately $600,000 in 2013 alone. This extrapolates to over $3 million in excess record keeping fees paid by the Plan and its participants to AEGON within the Relevant Period.

64.     Unlike other plans with more than $1 billion in assets, AEGON does not recapture

-23-

for the benefit of the Plan revenue sharing payments that exceed the per-participant record keeping costs. Instead, it allows

65. As a Plan fiduciary, AEGON is not permitted to charge its plan anything but its direct costs in providing record keeping services to its plan. 29 C.F.R. § 2550.408b-2(e).

66. In failing to negotiate revenue sharing recapture agreements for record keeping fees and in allowing AEGON and its affiliate to retain excessive record keeping fees, Defendants breached their fiduciary duties to the Plan.

## CLASS ACTION ALLEGATIONS

67. Plaintiff brings this action pursuant to FED. R. CIV. P. 23(a) and (b)(1), (b)(2), and/or (b)(3), on behalf of a proposed class comprised of the following:

> All participants in the Transamerica Profit Sharing Plan, formerly known as the AEGON Companies Profit Sharing Plan, during the period of April 7, 2009 to the present (the "Class"). Excluded from the Class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

68. Class certification is appropriate because all of the criteria for certification as a class action under FED. R. CIV. P. 23 are satisfied.

69. The members of the Class are so numerous as to make joinder impractical. The Plan had over 16,000 participants and beneficiaries during the plan year ending on December 31, 2013 and is believed to have had a similar number of participants and beneficiaries in every year of the Relevant Period, all of whom invested in at least one of the AEGON Funds during the Relevant Time period and all of whom suffered from the excessive plan administration fees charged by AEGON.

70. There are questions of law and fact common to the Class, including the following:

-24-

a.     Whether Defendants were fiduciaries of the Plan with responsibility for monitoring and making decisions with respect to the Plan's investment options, managers, services provided to the Plan and fees associated with those services;

b.     Whether Defendants breached their fiduciary duties to the Plan and Plan participants by causing the Plan to maintain investments of Plan assets in the AEGON-affiliated pooled separate account funds;

c.     Whether Defendants breached their fiduciary duties to the Plan and Plan participants by causing the Plan to pay, directly or indirectly, record keeping and plan administration fees to AEGON and its affiliates and subsidiaries;

d.     Whether the investment and service-provider decisions made by Defendants were solely in the interests of Plan participants and beneficiaries of the Plan;

e.     Whether Defendants breached their fiduciary duty by failing to defray Plan expenses and recapture excess and unreasonable compensation for record keeping services through revenue sharing rebates;

f.     Whether the Plan and Plan participants suffered losses as a result of Defendants' fiduciary breaches.

71.    Plaintiff's claims are typical of the claims of the Class. Defendants' conduct toward Plaintiff is, in its essence, identical to their conduct toward other members of the class and implicates the same set of concerns. Like members of the Class, Plaintiff incurred losses in the form of the payment, through the Plan, of excessive and unnecessary fees as a result of Defendants' breach of their fiduciary duties and prohibited transactions alleged herein. Such excess and unnecessary fees reduced the value of Plaintiff's and Class members' investments in the Plan.

72.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has

no interests antagonistic to the interests of the Class and is committed to the vigorous representation of the Class and prosecution of this case. Plaintiff has also retained counsel in this case who are experienced in class action and ERISA litigation.

73. Certification under Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. Under ERISA and the terms of the Plan, Defendants owe the same fiduciary duties and other statutory obligations to all members of the Class and are bound to administer the Plan uniformly as to all Class members. As a breach of fiduciary duty action against Plan fiduciaries, this action is a classic Rule 23(b)(1) class action.

74. Certification under Rule 23(b)(2) is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

75. Certification under Rule 23(b)(3) is appropriate because questions of law and fact common to the members of the Class predominate over individual questions and because the prosecution of this action on a class basis is superior to other available methods for the fair and efficient adjudication of this controversy. In particular:

a. The common questions of law and fact identified above are the core issues presented by this action. The answers to those questions will drive the litigation and resolve the liability issues under the relevant provisions of ERISA and applicable case law. There are no

-26-

individual issues other than the amount of recovery to which each Class member will be entitled should Plaintiff prevail, which can be determined by formula and reference to Plan records concerning each participant's investment in the Plan.

      b.     No Class member has an interest in individually controlling the prosecution of a separate action, as the claims of all Class members are the same and certification of the Class in this action will require a determination that Plaintiff will adequately represent the interests of all Class members. To Plaintiff's knowledge, no separate non-class actions have been filed by any members of the proposed Class.

      c.     Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

      d.     For many of the same reasons described above, a class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual Class members to bear the expense and burden of individual litigation to enforce their rights. Even if such actions were viable, the result would be a multiplicity of actions against the same Defendants, involving the same controversy, possibly in multiple jurisdictions. Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all Class members similarly as Plan participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings would pose the risk of inconsistent adjudications. Plaintiff is unaware of any difficulty in the management of this action as a class action.

CLASS ACTION COMPLAINT
*PHILIP KRAMER V. AEGON USA, LLC, ET AL.*

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Against all Defendants for Violation of 29 U.S.C. § 1104(a)(1) – Breach of Fiduciary Duties in Maintaining Plan Investments)**

76.     Plaintiff realleges and incorporates by reference as though set forth herein each of the allegations set forth in the foregoing paragraphs.

77.     As fiduciaries of the Plan, Defendants are obligated to discharge their duties with respect to the Plan solely in the interests of the participants and beneficiaries and for the exclusive purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administrating the Plan.

78.     Defendants violated its fiduciary duties to the Plan, in violation of 29 U.S.C. § 1104(a)(1), by maintaining investment funds in the Plan that were designed to benefit AEGON and its subsidiaries rather than participants and beneficiaries, with layers of excessive and unnecessary fees collected by AEGON and its affiliates, and by failing to contract directly with sub-advisors in order to minimize advisory fees and expenses.

79.     As a direct and proximate result of Defendants' breaches of their fiduciary duties to the Plan, the Plan and Class members lost millions of dollars in the form of excess fees.

80.     Pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C.§ 1109(a), Defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty of loyalty.

### SECOND CAUSE OF ACTION
**(Against All Defendants for Violation of 29 U.S.C. § 1106 – Causing the Plan to Engage in Prohibited Transactions in Connection with the Collection of Fees)**

81.     Plaintiff realleges and incorporates by reference as though set forth herein, each of the allegations set forth in the foregoing paragraphs.

82.     AEGON is a fiduciary with respect to the Plan.

83.     As a fiduciary and Plan sponsor, AEGON and its subsidiaries are parties in interest within the meaning of 29 U.S.C. § 1002(1) and § 1106, which prohibit, among other things, transactions involving the furnishing of goods or services between the Plan and a party in interest; and the transfer to, or use by or for the benefit of a party in interest, any assets of the Plan.

84.     By collecting or allowing the Plan to be charged excessive, unreasonable and/or unnecessary management fees received by AEGON or its subsidiaries, Defendants knowingly caused the Plan to engage in a prohibited transaction, in violation of 29 U.S.C. § 1106(a).

85.     Pursuant to 29 U.S.C. § 1109(a) and § 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan resulting from the breaches of duty and prohibited transactions and disgorge all revenues received by AEGON and its subsidiaries from the fees paid by the Plan to AEGON and its subsidiaries.  Plaintiff is also entitled to such equitable relief as the Court deems appropriate pursuant to 29 U.S.C. § 1132(a)(3).

### THIRD CAUSE OF ACTION
**(Against All Defendants for Violation of 29 U.S.C. §§ 1104 and 1106 – Breach of Fiduciary Duty and Prohibited Transactions in Connection with Defraying Reasonable Expenses)**

86.     Plaintiff alleges and incorporates by reference as though set forth herein, each of the allegations set forth in the foregoing paragraphs.

87.     AEGON is a fiduciary with respect to the Plan.

88.     As a fiduciary and Plan sponsor, AEGON and its subsidiaries are parties in interest within the meaning of 29 U.S.C. § 1002(1) and § 1106, which prohibit, among other things, transactions involving the furnishing of goods or services between the Plan and a party in interest; and the transfer to, or use by or for the benefit of a party in interest, any assets of the Plan.

89.     As fiduciaries of the Plan, Defendants are obligated to discharge their duties with respect to the Plan solely in the interests of the participants and beneficiaries and for the exclusive purposes of providing benefits to participants and their beneficiaries and defraying reasonable

-29-

expenses of administrating the Plan.

90.    Defendants violated their fiduciary duties and engaged in prohibited transactions by causing the Plan to pay AEGON and/or its subsidiary millions of dollars in annual record keeping and administrative fees beyond the cost of such services. Each year during the Relevant Period, the Plan paid, directly or indirectly, in discrete, periodic transactions, millions of dollars to AEGON in excess record keeping and administrative fees because Defendants failed to bargain for and obtain a cap on revenue sharing or revenue-sharing rebates.

91.    Defendants knew or should have known that the Plan could have negotiated far lower administrative fees, but Defendants caused the Plan to pay, directly or indirectly, millions of dollars to AEGON or its subsidiary.

92.    As a direct and proximate result of these breaches of duty and prohibited transaction violations, the Plan paid millions of dollars in unjustifiably high administrative fees and suffered millions of dollars in losses thereby.

93.    Pursuant to 29 U.S.C. § 1109(a) and § 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan resulting from the breaches of duty and prohibited transactions and disgorge all revenues received by AEGON and its subsidiaries from the fees paid by the Plan to AEGON and its subsidiaries, and Plaintiff is entitled to appropriate equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

94.    A declaration that Defendants breached their fiduciary duties;

95.    A declaration that Defendants violated ERISA § 406 by allowing the Plan to participate in prohibited transactions;

96.    An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Aegon  subsidiaries and affiliates by the Plan, including disgorgement of profits

-30-

thereon;

97. An order compelling Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA;

98. An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

99. Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in AEGON Funds;

100. An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

101. An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

102. An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

103. An order awarding such other and further relief as the Court deems equitable and just.

Dated:  April 7, 2015

J. Barton Goplerud IA Bar No. AT0002983
**HUDSON MALLANEY SHINDLER &**
**ANDERSON PC**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
jbgoplerud@hudsonlaw.net

-31-
CLASS ACTION COMPLAINT
PHILIP KRAMER V. AEGON USA, LLC, ET AL.

Case 1:15-cv-00031-EJM-JSS   Document 1   Filed 04/07/15   Page 31 of 32

Garrett W. Wotkyns*
Michael C. McKay*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 North Scottsdale Rd., Suite 270
Scottsdale, AZ 85253
Telephone: (480) 428-0142
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com

Todd M. Schneider,*
Mark T. Johnson*
Kyle G. Bates,*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
180 Montgomery St., Suite 2000
San Francisco, California 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
kbates@schneiderwallace.com

Todd S. Collins,*
Shanon J. Carson,*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
* *pro hac vice* application forthcoming

Attorneys for Plaintiff

-32-

CLASS ACTION COMPLAINT
*PHILIP KRAMER V. AEGON USA, LLC, ET AL.*
Case 1:15-cv-00031-EJM-JSS   Document 1   Filed 04/07/15   Page 32 of 32